**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-mc-564 (GMH)** |
| | ) | |
| **BOEHRINGER INGELHEIM** | ) | |
| **PHARMACEUTICALS, INC.** | ) | |
| | ) | |
| **Respondent.** | ) | |

_____)

## MEMORANDUM OPINION

This case is before the Court on remand from the Court of Appeals.  The Court is tasked

with deciding, consistent with the guidance from the D.C. Circuit, whether certain documents

created by Boehringer Ingelheim Pharmaceuticals, Inc. and subpoenaed by the Federal Trade

Commission are protected by either the work-product doctrine, the attorney-client privilege, or

both.  The Court has reviewed in camera all the documents at issue.  Upon review, the Court

concludes that most of the documents are mere fact work product and are therefore not protected

from disclosure.  However, Boehringer has asserted the attorney-client privilege in addition to

work-product protection for almost all these documents.  That privilege, and not the work-

product doctrine, supplies a proper basis on which to withhold the documents.[1]

---

[1] The relevant documents for purposes of this Memorandum Opinion are as follows: (1) Petition of the Federal
Trade Commission for an Order Enforcing Subpoena Duces Tecum Issued in Furtherance of a Law Enforcement
Investigation ("Pet.") [Dkt. 1]; (2) Status Memorandum of the Federal Trade Commission Advising the Court of
New Developments ("June 2010 Status Memo.") [Dkt. 32]; (3) Boehringer Ingelheim Pharmaceuticals, Inc.'s
Response to Federal Trade Commission Status Memorandum ("June 2010 Status Memo. Resp.") [Dkt. 37]; (4)
Reply of the Federal Trade Commission in Support of Its Status Memorandum ("June 2010 Status Memo. Reply")
[Dkt. 33]; (5) Boehringer Ingelheim Pharmaceuticals, Inc.'s Supplemental Response to Federal Trade Commission
Status Memorandum ("June 2010 Status Memo. Suppl. Resp.") [Dkt. 38]; (6) Joint Status Report Regarding
Remand from the United States Court of Appeals for the District of Columbia ("J. Rep.") [Dkt. 88]; (7) Order of
December 2, 2015 ("Dec. 2, 2015 Order") [Dkt. 89]; (8) Boehringer Ingelheim Pharmaceuticals, Inc.'s

# BACKGROUND

The relevant facts underlying these proceedings were ably described in the Court's prior opinion and in the decision of the Court of Appeals.  See FTC v. Boehringer Ingelheim Pharmaceuticals, Inc., 286 F.R.D. 101, 104–06 (D.D.C. 2012) ("Boehringer I"), aff'd in part, rev'd in part, and remanded, 778 F.3d 142 (D.C. Cir. 2015); FTC v. Boehringer Ingelheim Pharmaceuticals, Inc., 778 F.3d 142, 146–48 (D.C. Cir. 2015) ("Boehringer II").  The Court will summarize only the important background information here.  It will then describe the Court's prior ruling, the appeal to the D.C. Circuit, and the posture of the case on remand.

## A.      The Boehringer-Barr Litigation and the FTC Subpoena

The FTC filed an action to enforce a subpoena duces tecum directed at Boehringer.  See Petition to Enforce Subpoena [Dkt. 1].  The FTC is investigating a settlement agreement in a prior patent lawsuit between Boehringer and a generic drug manufacturer, Barr Laboratories.  Memorandum in Support of Petition to Enforce Subpoena [Dkt. 1–4] at 1–2.  The FTC wants to learn whether Boehringer and Barr engaged in unfair trade practices or violated antitrust laws.  Id.  In the subpoena that is the subject of the instant suit, the FTC seeks documents from Boehringer relating to the patent litigation, the settlement of that litigation, and other agreements between Boehringer and Barr entered into at the time of settlement.  Id. at 5–6.

The patent litigation and settlement underlying the FTC's investigation can be briefly summarized.  Boehringer manufactures the drugs Aggrenox and Mirapex, of which Barr

Supplemental Briefing Regarding Remaining Privilege Disputes ("Resp. Suppl. Br.") [Dkt. 90]; (9) Boehringer Ingelheim Pharmaceuticals, Inc.'s Motion to File Ex Parte Supplemental Declaration of Marla Persky ("Decl. Mot.") [Dkt. 91]; (10) Opposition of the Federal Trade Commission to Boehringer Ingelheim Pharmaceuticals, Inc.'s Motion to File Ex Parte Supplemental Declaration of Marla Perky ("Decl. Mot. Opp.") [Dkt. 92]; (11) Reply in Support of  Boehringer's Motion to File Ex Parte Supplemental Declaration of Marla Persky ("Decl. Mot. Reply") [Dkt. 93]; (12) Supplemental Brief of the Federal Trade Commission in Remand Proceedings ("Pet. Suppl. Br.") [Dkt. 94]; (13) Boehringer Ingelheim Pharmaceuticals, Inc.'s Motion for Leave to File a Short Reply Brief ("Mot. to File Reply") [Dkt. 95]; and (14) Opposition of the Federal Trade Commission to Boehringer Ingelheim Pharmaceuticals, Inc.'s Motion for Leave to File a Short Reply Brief ("Mot. to File Reply Opp.") [Dkt. 96].

developed generic versions.  Boehringer sued Barr for patent infringement in what is termed the "Mirapex litigation."  See Boehringer Ingelheim Int'l GmbH v. Barr Labs., 562 F. Supp. 2d 619, 622 (D. Del. 2008), rev'd 592 F.3d 1340 (Fed. Cir. 2010).  After Boehringer lost at trial but won a reversal from the Federal Circuit on appeal, the parties agreed to settle the case.  See Boehringer I, 286 F.R.D. at 105.  During the course of the lawsuit, Marla S. Persky was the Senior Vice President, General Counsel, and Secretary of Boehringer Ingelheim USA Corporation, Boehringer Ingelheim Corporation, and Boehringer Ingelheim Pharmaceuticals, Inc. Id.  She helped advise her client on the settlement terms and surrounding agreements.  Id. As will be seen, she sits at the center of this subpoena enforcement action.

After the settlement, the FTC opened a formal investigation to determine whether Boehringer and Barr had engaged in unfair methods of competition through their settlement and other agreements.  Id.  Of particular concern to the FTC were the following terms of their settlement:  (1) Barr would not market its generics for Aggrenox and Mirapex until shortly before Boehringer's patents expired; and (2) in exchange for fees and royalties, Barr would help promote Aggrenox until Barr's generic entered the market.  Boehringer II, 778 F.3d at 146.  To the FTC, these terms made it appear as though Barr agreed to delay marketing its generics, giving Boehringer a monopoly on profits for a time and, in exchange, Boehringer would pay off Barr from those sales.  Boehringer I, 286 F.R.D. at 105.

During the investigation, the FTC served on Boehringer a subpoena for documents.  Id. Boehringer did not comply with it.  Id.  The FTC filed this petition seeking enforcement of the subpoena.  Id.  Specifically, the FTC requested that the Court order Boehringer to comply with the subpoena and turn over all relevant documents concerning the following topics:  (1) the patent litigation; (2) sales, profits, and marketing of the brand-name drugs; (3) the settlement

agreement; (4) co-marketing with Barr and other firms; (5) Barr's marketing of the generics; and (6) analyst reports on the drugs.  Id.  For several months, the Court oversaw the production documents responsive to the subpoena.  See id. at 106.

     **B.**     **Boehringer I**

After Boehringer reported to the Court that it had fully complied with the subpoena, the FTC objected, noting that Boehringer had withheld many documents under claims of either work-product protection or the attorney-client privilege.  Id.  The FTC identified several categories of documents which Boehringer withheld under privilege claims, including:  (1) the financial analyses of a co-promotion agreement between Boehringer and Barr regarding Aggrenox; (2) forecasting analyses of possible timelines for Barr's generic drug to enter the market; (3) financial analyses of the business terms of the settlement agreement; and (4) notes taken by business executives.  Id. at 108.  The FTC argued that it had "an overriding and compelling need" for disclosure of these documents.  Id.  Further, the FTC asserted that the attorney-client privilege did not apply because the documents were "business documents that had no attorney as an author or recipient, or included an attorney only as part of a distribution to business executives."  Id.

Boehringer, at the Court's direction, provided a sample set of documents for the Court to review in camera.  Id. at 106.  That sample of 105 documents, which was submitted in camera and ex parte, is representative of the total number of documents over which Boehringer claims privilege.  Id.  Boehringer also submitted, in camera and ex parte, affidavits from attorney Persky and from attorney Pamela Taylor, who represents Boehringer in the FTC investigation.  Id. at 109.  The Court examined those documents and issued a memorandum opinion sustaining in part

and overruling in part Boehringer's assertions of privilege.  Id. at 108.[2]

The Court addressed the relevant documents by category.  Id. at 108–12.  First, the Court examined the financial analyses of the co-promotion agreement, the forecasting analyses regarding Barr's generic, and financial analyses used to evaluate the settlement agreement.  Id. at 108.  Boehringer contended that these sorts of documents, while often prepared in the ordinary course of business (and not under threat of impending litigation), were "specially prepared at the request of [Boehringer's] counsel in response to litigation."  Id. at 108–09.  In Boehringer's view, then, the documents constituted work product.  Id. at 109.  Morever, Boehringer claimed that the analyses at issue were "premised on frameworks provided by Persky and were prepared for her use" and were therefore subject to the attorney-client privilege.  Id.

The FTC rejoined that the co-promotion agreement regarding Aggrenox was distinct from the settlement in the Boehringer-Barr litigation and was therefore not work product.  Id.  Boehringer replied that the co-promotion agreement, while "freestanding," was negotiated during settlement and that haggling over the terms of the co-promotion agreement informed the development of the settlement agreement.  Id.  Because the co-promotion agreement arose during settlement negotiations, it was, in Boehringer's opinion, part of the settlement.  Id.

The Court concluded that the co-promotion agreement was "an integral part of the litgation" and that "disclosure of the attorneys' and their agents' mental processes qualify for [work-product] protection since the process of deciding whether to settle a case is necessarily created because of the prospect of litigation."  Id.  The Court relied heavily on the ex parte

[2] Initially, the Court determined that the common law and Federal Rule of Civil Procedure 26 should govern Boehringer's claims of attorney-client privilege and work-product protection.  Id. at 106–07 ("'The nature of a subpoena enforcement proceeding, under common sense and precedents in this circuit and elsewhere, thus rests soundly in federal law, and federal law of privilege governs any restrictions on the subpoena's scope.'") (quoting Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp., 5 F.3d 1508, 1513 (D.C. Cir. 1993)).  No party challenged that conclusion, and the Court of Appeals left it undisturbed.

affidavits Boehringer submitted, in which the attorneys averred that the financial analyses were prepared during settlement discussions at the request of Boehringer attorneys who were negotiating the settlement.  Id.  Further, the Court reasoned that the documents themselves confirmed attorney Persky's claims that the analyses were created at her direction.  Id.  The Court found that "[t]his was information she needed in order to provide her client . . . with legal advice regarding the potential settlement[.]"  Id.  The Court held that "[i]nformation used to assess settlement option [sic] clearly falls within the ambit of the work product doctrine."  Id. (citing Willingham v. Ashcroft, 228 F.R.D. 1, 4 (D.D.C. 2005)).

The Court rejected the FTC's contention that the analyses were separate and apart from the settlement negotiations, finding that the specific reports at issue "were prepared using information and frameworks provided by [Boehringer] attorneys and constitute work product intended to aid these attorneys in the settlement process."  Id.  Moreover, because Boehringer represented to the Court that any freestanding, non-litigation-based financial analyses were previously disclosed to the FTC, "the only additional information the documents at issue would yield is the mental thought processes of [Boehringer's] attorneys as they prepared for settlement negotiations."  Id.  Accordingly, the Court concluded that these documents were work product because they were "prepared for counsel and were not business forecasts made in the ordinary course of business."  Id.

Having found that the analyses qualified as work product, the Court next addressed the FTC's claim that they should nevertheless be disclosed because the FTC had an "overriding and compelling need for them to complete the administrative investigation."  Id.  The FTC argued that it had no other way to obtain the information in the documents and claimed that Boehringer should not be able to use them "both as a sword (to claim their business deal was a fair

transaction) and a shield (using claims of privilege to prevent anyone from looking into the validity of such a claim)." Id. at 109–10.

The Court rejected this argument for two reasons. Id. at 110. First, the Court found that the work product at issue was opinion work product, which, unlike factual work product, cannot be discovered merely on a showing of substantial need. Id.; see also Upjohn Co. v. United States, 449 U.S. 383, 400 (1981); Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1307 (D.C. Cir. 1997) ("Opinion work product . . . is virtually undiscoverable."). The Court further found that "the factual inputs" in the documents "cannot be reasonably segregated from the analytical outputs." Boehringer I, 286 F.R.D. at 110. In other words, disclosing which data the Boehringer attorneys requested to be analyzed in connection with settlement would "necessarily reveal the attorneys' mental impressions, including, at a bare minimum, that the attorneys believed such analyses of that data was [sic] necessary or important to determining an appropriate settlement." Id.

Second, the Court disagreed that the FTC had an overriding need for the documents. Id. The Court, after reviewing all the documents in the sample, reasoned that "there are no smoking guns contained in these documents; rather, they are the sort of financial analyses one would expect a company exercising due diligence to prepare when contemplating settlement options." Id. To the Court, the documents "yield[ed] nothing more than the arithmetical calculation of various potential scenarios and are not in any way evidence of any conspiratorial intent to violate the law." Id. The Court observed that

> No one is pretending that the FTC is not fully aware of the deal that was made or of the economic benefits the deal makers were trying to achieve. The arithmetic of various potential scenarios adds nothing to what is already known about what the involved companies intended in settling their suit. Although I am sympathetic to the FTC's argument that these financial analyses are the only documents that could demonstrate whether or not [Boehringer] was using the co-promotion

> agreement to pay Barr not to compete, I am afraid that they cast no light of
> whether that intendment existed.

Id.  Because the FTC could not demonstrate the especially compelling need required to discover

opinion work product, the Court upheld Boehringer's claim of work-product protection.  Id.  In

closing the analysis, the Court noted that emails transmitting the analytical reports could be

disclosed if fact work product in them could be excised from the opinion work product.  Id.

After considering Boehringer's financial analyses, the Court next examined a category of

documents comprising emails, notes, and correspondence regarding strategic decisions,

settlement possibilities, and settlement options, including correspondence between Boehringer

executives.  Id.  For the same reasons marshalled to uphold Boehringer's work-product claim

with respect to financial analyses, the Court found that this category of correspondence should be

protected as opinion work product.  Id.  Additionally, the Court rejected the FTC's contention

that the attorney-client privilege should not cover some of the correspondence, which was

"circulated principally between executives, rather than between attorneys and executives."  Id. at

111.  The FTC claimed that the privilege cannot exist between non-attorneys.  Id.  The Court

disagreed, finding that "[t]he documents themselves indicate . . . that they were intended to be

confidential communication between the client, [Boehringer], and its attorneys."  Id.  Thus, the

Court found that this category of correspondence was protected not only as work product but

also by the attorney-client privilege.  Id.

The final category of documents the Court addressed consisted of emails reflecting

requests for legal advice or conveying requests from attorneys for information to be used in

settlement negotiations.  Id.  For these documents, the Court found that, while the work-product

doctrine did not apply, the communications were protected by the attorney-client privilege.  Id.

Again, the FTC objected that a communication between two non-lawyers cannot qualify as an

attorney-client privileged communication.  Id.  Once again, the Court disagreed, concluding that

"communications among employees of a client are still afforded the protection of the privilege,

so long as the communications concern legal advice sought or received that was intended to be

confidential."  Id. (citing Long v. Anderson Univ., 204 F.R.D. 129, 134 (S.D. Ind. 2001);

Johnson v. Sea–Land Servs. Inc., No. 99–civ–9161, 2001 WL 897185, at *2 (S.D.N.Y. Aug. 9,

2011)).  Thus, the Court found that emails conveying a request for legal advice were protected by

the attorney-client privilege even though neither the authors nor the recipients were attorneys.

Id.  Nevertheless, the Court ordered that if a long email chain contained some non-privileged

emails which could be excised from the remainder, those emails should be disclosed.  Id.

### C.   Boehringer II

The FTC appealed.  Boehringer II, 778 F.3d at 145.[3]  The FTC challenged the Court's

ruling only as to one category of documents identified below – the financial analyses of the co-

promotion agreement, the forecasting analyses regarding Barr's generic, and financial analyses

used to evaluate the settlement agreement.  Id. at 147 (noting that the Court's rulings on "emails,

notes, and reports on strategic decisions and other issues[,] emails containing legal advice or

requests for legal advice[,] transmittal emails[,] and duplicate documents" were not challenged in

the appeal); see also Brief of Appellant Federal Trade Commission, FTC v. Boehringer

Ingelheim Pharmaceuticals, Inc., 778 F.3d 142 (D.C. Cir. 2015) (No. 12-5393), 2013 WL

3271346, at *13–16 (limiting appeal to financial documents analyzing settlement and co-

promotion agreement).

The D.C. Circuit affirmed the Court's finding that the co-promotion agreement was

---

[3] The Court issued another opinion soon after the one discussed above which addressed the adequacy of
Boehringer's search for documents relevant to the FTC's subpoena, but neither party appealed that decision.  See
generally FTC v. Boehringer Ingelheim Pharmaceuticals, Inc., 898 F. Supp. 2d 171 (D.D.C. 2012).

prepared "in anticipation of litigation" because it was incorporated into the settlement agreement, notwithstanding the fact that it had independent business significance apart from the settlement. Boehringer II, 778 F.3d at 146.  The Court of Appeals also affirmed the Court's conclusion that the vast majority of the co-promotion materials were protectable as work product.  Id.  However, the D.C. Circuit remanded with respect to small body of co-promotion documents prepared after the settlement agreement was executed, a temporal distinction which the Court below failed to address.  Id.  Finally, the Court of Appeals reversed the Court and remanded on the issue of whether these documents were fact or opinion work product, which the D.C. Circuit found the Court to have misapprehended.  Id.

In reaching this conclusion, the Court of Appeals canvassed the history of the work-product doctrine from its genesis in Hickman v. Taylor, 329 U.S. 495 (1947), to its codification in Federal Rule of Civil Procedure 26(b)(3)(A) and discussed the relevant standard employed in this Circuit for determining whether a document has been created "in anticipation of litigation" as required by Rule 26(b)(3)(A).  Boehringer II, 778 F.3d at 148–49.  The Court of Appeals reiterated the long-standing "because of" test, which asks "'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  Id. at 149 (quoting United States v. Deloitte LLP, 610 F.3d 129, 137 (D.C. Cir. 2010) (internal quotation marks omitted)). The Court of Appeals noted that "[w]here a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available."  Id. (quoting Deloitte, 610 F.3d at 138).

The D.C. Circuit found that the co-promotion agreement, although it had "independent economic value apart from the litigation settlement," was still properly considered work product.

Id. at 150.  The Circuit court rejected the notion that every business transaction that can be severed from a settlement cannot be protected as work product.  Id.  In the court's view, "[c]ommon sense and practical experience teach that settlement deals routinely include arrangements that could be isolated from the overall agreement and stand on their own but were nonetheless crafted for the purpose of settling litigation."  Id.  Thus, the Court of Appeals affirmed the Court's finding below that the co-promotion agreement was "integral" to settlement of the Boehringer-Barr suit and was therefore created in anticipation of that suit.  Id.

The D.C. Circuit remanded, however, as to several documents prepared after the settlement agreement was executed.  Id. at 151.  This Court lumped these documents in with the pre-settlement analyses, reasoning that all were created in anticipation of the Boehringer-Barr litigation and settlement.  Id.  The D.C. Circuit observed this discrepancy but nevertheless instructed that these documents may constitute work product or be protected as attorney-client communications because they "contain information initially prepared in anticipation of the settlement, relat[e] to other pending litigation, or involve[e] requests for or the provision of legal advice."  Id.  The Court of Appeals remanded for this Court to consider those grounds in the first instance since they were not the reasons this Court articulated in its opinion.  Id.

The D.C. Circuit next analyzed this Court's conclusion that many of the analyses were opinion work product, not fact work product.  Id.  In laying out the principles to be applied, the Court of Appeals noted that "[w]hen a factual document selected or requested by counsel exposes the attorney's thought processes and theories, it may be appropriate to treat the document as opinion work product, even though the document on its face contains only facts."  Id. (citing Dir., Office of Thrift Supervision, 124 F.3d at 1308).  However, the Court of Appeals cautioned that "'not every item which may reveal some inkling of a lawyer's mental impressions

. . . is protected as opinion work product.'" Id. (quoting In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1015 (1st Cir. 1988)). Instead, "[o]pinion work product protection is warranted only if the selection or request reflects the attorney's focus in a meaningful way." Id. Additionally, a court reviewing a claim of work product protection must discern whether factual material in a document can be disclosed without revealing an attorney's mental impressions. Id. at 152.

The Court of Appeals found that the analyses at issue here were pervaded by factual information that did not give insight into Boehringer's counsel's legal impressions or views of the case. Id. The court contrasted the instant situation with In re Sealed Case, 146 F.3d 881 (D.C. Cir. 1998), in which the Circuit court held that facts recorded in an attorney's notes of preliminary interviews with a witness were not protectable merely because the attorney chose to write down those facts. Id. at 236–37. Rather, to rise to the level of opinion work product, the document must reflect that the attorney "sharply focused or weeded the materials." Id. at 236.

Unlike In re Sealed Case, the D.C. Circuit found that the Court's opinion below incorrectly "implied that an attorney's mere request for a document was sufficient to warrant opinion work product protection." Boehringer II, 778 F.3d at 152. In the Court of Appeals' view, "counsel's requests were often general and routine" and "the only mental impression that can be discerned is counsel's general interest in the financials of the deal." Id. The D.C. Circuit found these were not the sort of mental impressions or opinions the work-product doctrine was meant to protect, observing that "such interest reveals nothing at all:  anyone familiar with such settlements would expect a competent negotiator to request financial analyses like those performed here, and Boehringer does not attempt to hide this interest in its briefs." Id. Because Boehringer's counsel's thoughts were "already well-known," then, there existed no danger of

revealing those attorneys' mental impressions.  Id.

Furthermore, the Court of Appeals found that attorney Persky conceded in testimony before the FTC that her requests for financial information were directed at answering "whether the agreements made financial sense [as] a matter of business judgment," not as a foundation for providing legal counsel.  Id.  In other words, merely because an attorney, Ms. Persky, led the settlement negotiations did not mean that her "thoughts relating to financial and business decisions are opinion work product when she [was] simply parroting the thoughts of the business managers."  Id. at 153.

Finally, the Court of Appeals disagreed with this Court's emphasis that the analyses were prepared using "information and frameworks" providing by counsel.  Id.  The D.C. Circuit found that the "information and frameworks" relied on by this Court "had no legal significance."  Id.  Instead, most were innocuous indications of the time frames for requested financial data.  Id.  In the D.C. Circuit's view, Boehringer had not articulated a viable explanation for why disclosure of a time frame for data would reveal their attorneys' mental impressions.  Id.  The Court of Appeals held that "[w]here it appears that the focus or framework provided by counsel is obvious or non-legal in nature, it is incumbent upon the party claiming opinion work product protection to explain specifically how disclosure would reveal the attorney's legal impressions and thought processes."  Id.  "Where an attorney's mental impressions are those that 'a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description 'legal theory,'' those impressions are not opinion work product."  Id. (quoting In re HealthSouth Corp. Sec. Litig., 250 F.R.D. 8, 11 (D.D.C. 2008)).  The Court of Appeals found that the Court below erred when it "failed to demand such a showing from Boehringer and instead concluded categorically that the contested documents were highly protected opinion

work product." Id.

The D.C. Circuit then proceeded to explain why the distinction between fact and opinion work product in this case was critical. Id. Whereas opinion work product can only be discovered on an "'extraordinary showing of necessity,'" fact work product requires the party seeking discovery to propound "'adequate reasons'" why those facts should be disclosed. Id. (quoting In re Sealed Case, 676 F.2d at 809–11); see also Fed. R. Civ. P. 26(b)(3)(A)(ii) (requiring a party seeking to discover factual work product to demonstrate that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means"). This Court, finding that the analyses represented opinion work product, had only considered whether the FTC had met the virtually unreachable standard for such materials. Id.

The Court of Appeals found that this Court did not properly fulfill its duty to determine whether some of the work product in the analyses was merely factual and, in turn, whether those facts could be segregated from any opinion work product. Id. at 154. In so doing, it rejected Boehringer's contention that the FTC must demonstrate that the facts sought were "critical to, or dispositive of, a key issue at trial." Id. According to the D.C. Circuit, "although some courts have demanded a heightened showing of a document's relevance or probative value for discovery of fact work product, we have never characterized Rule 26(b)(3)'s 'substantial need' requirement in this manner." Id. (internal citations omitted). Thus, the Court of Appeals concluded that the lack of "smoking guns" in the documents was not fatal to the FTC's claim of need. Id. at 154–56.

The D.C. Circuit also explained that a heightened relevance standard was especially inappropriate in the instant enforcement proceeding. Id. at 157. The court reasoned that "in the

investigatory context here[,]" the FTC was entitled to learn facts on a broader scale than available to a typical civil litigant.  Id.  Specifically, in assessing relevance, a court in an administrative subpoena enforcement proceeding "'is not free to speculate about the possible charges that might be included in a future complaint, and then to determine the relevance of the subpoena requests by reference to those hypothetical charges.'"  Id. (quoting FTC v. Texaco, Inc., 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc)).  Because the FTC is "merely exercising its legitimate right to determine the facts" and to decide whether a complaint should issue," Texaco, 555 F.2d at 874, the fact that the analyses "reveal an absence of conspiratorial intent . . . may be helpful to the FTC in determining whether to issue a complaint in the first place."  Boehringer II, 778 F.3d at 157; see also id. at 147 (noting that the Boehringer-Barr settlement, while "not necessarily unlawful, . . . may be subject to antitrust scrutiny if it appears that the patent-holding firm – here, Boehringer – was using the co-promotion agreement as a vehicle to avoid legitimate competition").

Having disposed of Boehringer's argument for a heightened relevance standard, the Circuit court articulated a lower threshold, concluding that that "a moving party's burden is generally met if it demonstrates that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself."  Id. at 155.  Because the Court below found that the analyses "are relevant to the FTC's investigation and would provide unique information that the FTC cannot reasonably obtain elsewhere," the FTC had satisfied the requirements for discovering any fact work product contained in the financial and forecasting analyses.  Id.  Accordingly, the Court of Appeals remanded the matter to this Court for further consideration of how much of the documents constituted fact work product that should be

produced to the FTC.  See id. at 158.  The D.C. Circuit also observed that "[t]o the extent that any such documents were withheld in whole or in part on the alternative basis of attorney-client privilege, the District Court will have to determine whether this privilege independently bars discovery."  Id.

### D.   Remand

Following remand, the Court convened a status hearing so that the parties and the Court could discuss the issues remaining to be decided.  See generally Transcript of Sept. 17, 2015 Status Hearing [Dkt. 87].  Consistent with the Court's instructions at the hearing, the parties thereafter submitted a joint status report which relayed the parties' positions on several topics, the most important of which were:  (1) which documents needed to be reanalyzed on remand; (2) whether additional briefing would be required on the issues to be decided on remand and, if so, the nature of the briefing; and (3) whether the Court should take additional evidence to aid its assessment of Boehringer's privilege claims, including whether it should permit the submission of new in camera, ex parte affidavits.  J. Rep. at 1–23.  As before, the parties agreed that the Court's rulings on documents within the representative sample previously examined would be applied to the body of disputed documents as a whole.  See id. at 23–24.

On the basis of the joint status report, the Court issued an order identifying the documents it planned to review during these remand proceedings.  Dec. 2, 2015 Order at 1–2.  Those documents include:  (1) documents that were prepared after the Boehringer-Barr settlement agreements were executed; and (2) non-duplicative documents identified in Categories A, B, and E of the appendix to the district court's prior order, see Boehringer I, 286 F.R.D. at 112 (Appendix A), to the extent such documents came within the scope of the FTC's appeal as defined in its opening brief on appeal, see Brief of Appellant Federal Trade Commission, 2013

WL 3271346, at *12–16 (June 28, 2013).  Specifically, the Court stated that it would review non-duplicative documents within Categories A, B, and E that contained (1) financial analyses of the co-promotion agreement, (2) financial forecasts of alternative timelines for generic entry into the market, or (3) financial analyses of settlement options or terms.  Dec. 2, 2015 Order at 2.

The Court also set a briefing schedule.  Id. at 2–3.  While the Court did not forbid Boehringer from submitting additional or revised ex parte affidavits, its Order warned that Boehringer would face a heavy burden in convincing the Court that such submissions should be allowed and considered.  See id. at 2.  The Court ordered Boehringer to file on the public docket redacted copies of any affidavits submitted ex parte.  Id.

The parties filed supplemental briefing pursuant to the Court's schedule.  As expected, as part of its supplemental brief, Boehringer asked leave of the Court to file a supplemental ex parte affidavit from attorney Persky, see Decl. Mot. at 1, which the FTC opposed, see Decl. Mot. Opp. at 1.  Additionally, after the FTC filed its supplemental brief, which was supposed to be the final brief submitted under the Court's schedule, Boehringer sought leave to file "a short reply brief," which the Court will deny.[4]

---

[4] As this Court has said in relation to motions for leave to file sur-replies in the summary judgment context:

> In general, sur-replies are "disfavored."  Glass v. Lahood, 786 F. Supp. 2d 189, 231 (D.D.C. 2011).  A court should only permit leave to file a sur-reply if the moving party is otherwise unable to address matters raised for the first time in the non-movant's reply brief.  See Ben–Kotel v. Howard Univ., 319 F.3d 532, 536 (D.C. Cir. 2003).  But the matter covered in the sur-reply "must truly be new."  Pogue v. Diabetes Treatment Centers, 238 F. Supp. 2d 270, 277 (D.D.C. 2002).  "Simply put, a sur-reply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties.  Were that not true, briefing would become an endless pursuit."  Crummey v. Social Security Admin., 794 F. Supp. 2d 46, 63 (D.D.C. 2011), aff'd, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012).

Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 154 (D.D.C. 2015).  The Court finds that the arguments raised by the FTC in its supplemental brief were foreseeable and cite to evidence already in the record.  Thus, there is no basis on which to conclude that Boehringer needs additional space to counter new arguments.  In any event, the reply brief and its opposition dispute minutiae not helpful to the Court's ultimate analysis.  Accordingly, Boehringer's motion for leave to file its reply brief will be denied.

## LEGAL STANDARDS

Boehringer bears the burden, as the party resisting the FTC's subpoena on the basis of privilege, to show that the privileges invoked apply here.  United States v. Legal Servs. for N.Y.C., 249 F.3d 1077, 1081 (D.C. Cir. 2001); In re Lindsey, 158 F.3d 1263, 1270 (D.C. Cir. 1998).  "The basis of [a] privilege must be adequately established in the record, through evidence sufficient . . . to establish the privilege . . . with reasonable certainty."  In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n, 439 F.3d 740, 750 (D.C. Cir. 2006) (alterations in original) (quotation marks omitted).  This requires the party asserting privilege to "adduce competent evidence in support of its claims," something beyond "conclusory statements, generalized assertions, and unsworn averments of its counsel."  In re Veiga, 746 F. Supp. 2d 27, 33–34 (D.D.C. 2010).  The contours of the two privileges at issue – the attorney-client privilege and the work-product doctrine – are detailed below.

### A.    Attorney-Client Privilege

The attorney-client privilege protects confidential communications between clients and their attorneys made for the purpose of securing legal advice or services.  Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997).  It is not sufficient to show merely that the communication was between client and attorney.  Banks v. Office of Senate Sergeant–at–Arms, 222 F.R.D. 1, 3 (D.D.C. 2004).  Instead, courts in this Circuit apply the "primary purpose test," which asks whether "one of the significant purposes" of the communication was to obtain or give legal advice.  In re Kellogg Brown & Root, Inc., 756 F.3d 754, 757–60 (D.C. Cir. 2014).  In arriving at this formulation of the test, our Court of Appeals rejected a strict "but for" requirement under which a communication could not be privileged if there was any purpose behind it other than seeking or providing legal advice.  Id.

Normally, only attorney-client communications themselves, not the underlying facts, are privileged.  Upjohn Co. v. United States, 449 U.S. 383, 395–96 (1981).  But attorney-client communications can be "shielded if they rest on confidential information obtained from the client."  Id.  Further, purely factual exchanges between attorney and client merit protection when those facts are provided to the attorney at his request for the purpose of enabling him to provide legal advice.  See In re Kellogg, 756 F.3d at 760; Banks v. Office of Senate Sergeant-at-Arms, 228 F.R.D. 24, 27 (D.D.C. 2005).  However, "when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged."  Brinton v. Dep't of State, 636 F.2d 600, 604 (D.C. Cir. 1980).

The matter is a little more complicated when, as here, a claim of privilege is made by a corporation based on communications it had with its in-house counsel.  The mere fact that a lawyer may be in-house counsel for a corporation "alone does not dilute the privilege."  Id.  As the Supreme Court has observed, "[i]n light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, 'constantly go to lawyers to find out how to obey the law[.]'"  Upjohn, 449 U.S. at 393 (quoting Burnham, The Attorney–Client Privilege in the Corporate Arena, 24 Bus. Law. 901, 913 (1969)).  The Court has instructed that the privilege covers not only communications between an attorney and high-level corporate officers, known as the "control group," but also between the attorney and any corporate employee acting at the direction of corporate superiors in order to secure legal advice for the corporation.  Id. at 394.  This is particularly true when corporate officers and directors simply do not have the information counsel requires to provide cogent legal advice.  Id.

Yet in-house counsel may have "certain responsibilities outside the lawyer's sphere," and, as a result, the corporation "can shelter [the attorney's] advice only upon a clear showing

that [the attorney] gave it in a professional legal capacity." In re Sealed Case, 737 F.2d at 99; see also Neuder v. Battelle Pacific Nw. Nat'l Lab., 194 F.R.D. 289, 292 (D.D.C. 2000) (finding that communications are not privileged where in-house counsel "is acting solely in his capacity as a business advisor" and "the legal advice," if any, "is merely incidental to business advice"). Moreover, "a corporate client should not be allowed to conceal a fact by disclosing it to the corporate attorney." Neuder, 194 F.R.D. at 293 (quotation marks omitted). Thus, "documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made primarily for legal advice." Id. at 295.

This Court and the D.C. Circuit have consistently emphasized that "the 'attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" In re Lindsey, 258 F.3d at 1272 (quoting In re Sealed Case, 676 F.2d at 807 n. 44 (internal quotation omitted)). This privilege "carries costs," including the withholding of potentially critical evidence from the factfinder. In re Kellogg, 756 F.3d at 764. Courts tolerate the privilege only to the extent necessary "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998) (quoting Upjohn, 449 U.S. at 389); Western Trails, Inc. v. Camp Coast to Coast, Inc., 139 F.R.D. 4, 8 (D.D.C. 1991) ("The privilege is an exception . . . to the fundamental principle that discovery should be liberal and broad in furtherance of the search for truth.").

### B. Work-Product Doctrine

The Court of Appeals gave a thorough overview of the work-product doctrine in Boehringer II. The Court pauses here to highlight only a few other basic principles underlying

the doctrine.  The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3),

which provides, in relevant part:

> (A) Documents and Tangible Things.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) Protection Against Disclosure.  If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)–(B).  The Supreme Court initially developed the work product

doctrine in Hickman v. Taylor, 329 U.S. 495, 510–11 (1947), explaining that

> [I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.  Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

Under Hickman, a party seeking such materials must establish "adequate reasons to justify

production through subpoena or court order," and even then, discovery is limited to "relevant and

non-privileged facts."  Id. at 511–12.  The Supreme Court has observed that the work product

doctrine is "an intensely practical one, grounded in the realities of litigation in our adversary

system."  United States v. Nobles, 422 U.S. 225, 238 (1975).

Under Rule 26, the Court must engage in a multi-step inquiry.  First, the party asserting

work-product protection must demonstrate that the document in question was prepared "in

anticipation of litigation."  Fed. R. Civ. P. 26(b)(3).  To answer this question, the D.C. Circuit

has directed the Court to use the "because of" test, explained above.  Boehringer II, 778 F.3d at

149 (quoting Deloitte, 610 F.3d at 137).  If the party asserting work-production protection clears

that hurdle, the burden shifts to his opponent to satisfy the Court that the materials sought are

relevant under the standard articulated in Rule 26(b)(1).  Fed. R. Civ. P. 26(b)(3)(A)(i).  That

standard, which recently changed with amendments to the Rules in December 2015, now states:

> (1) Scope in General.  Unless otherwise limited by court order, the scope of
> discovery is as follows:  Parties may obtain discovery regarding any
> nonprivileged matter that is relevant to any party's claim or defense and
> proportional to the needs of the case, considering the importance of the issues at
> stake in the action, the amount in controversy, the parties' relative access to
> relevant information, the parties' resources, the importance of the discovery in
> resolving the issues, and whether the burden or expense of the proposed discovery
> outweighs its likely benefit.  Information within this scope of discovery need not
> be admissible in evidence to be discoverable.

Id. 26(b)(1).

Next, the Court must examine whether the materials sought constitute fact or opinion

work product.  See id. 26(b)(3); Boehringer II, 778 F.3d at 151.  Once the materials at issue are

properly categorized, the party seeking them must then show sufficient need for them and undue

hardship in obtaining them by other means.  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Again, the

distinction between fact and opinion work product is critical at this juncture because opinion

work product is "virtually undiscoverable," Dir., Office of Thrift Supervision, 124 F.3d at 1307,

while fact work product can be obtained merely by showing "'adequate reasons'" for disclosure,

Boehringer II, 778 F.3d at 153 (quoting In re Sealed Case, 676 F.3d at 809).

The work-product doctrine often walks side-by-side with the attorney-client privilege, so

it is important to note how they differ.  Work product protection is usually broader than the

attorney-client privilege because it is not restricted solely to confidential attorney-client

communications.  In re Sealed Case, 676 F.2d at 808–09.  Yet the work-product doctrine protects

only work performed in anticipation of litigation.  Boehringer II, 778 F.3d at 149.  Notably, a document that qualifies as work product in one case will retain that status even in subsequent, unrelated litigation.  Id.

## DISCUSSION

Before the Court reaches the merits of Boehringer's privilege claims, it must resolve several preliminaries.  First, the Court sets forth the documents that are within the scope of the Court of Appeals' remand, thus defining the set of documents affected by the merits decisions made today.  Second, the Court denies Boehringer's motion to submit a supplemental ex parte affidavit from attorney Persky.  The Court finds that Boehringer has not shown that the interests at stake in this litigation are on par with those interests normally warranting ex parte treatment.

Third, the Court concludes that nearly all the documents at issue here constitute fact work product, not opinion work product.  This is because the documents themselves convey no legal impressions or opinions; instead, they contain facts which Persky and her team later used to form legal opinions.  Finally, the Court finds all documents for which the attorney-client privilege is claimed should be privileged from disclosure.  As noted above, the work-product doctrine and the attorney-client privilege can protect the same document but for different reasons.  The discussion below demonstrates that, in this case at least, documents containing factual work product, when compiled at the request of an attorney for the purpose of rendering legal advice, fall under the protections of the attorney-client privilege and therefore are not subject to disclosure.

### A.    The Scope of Remand

The first question the Court must consider is what documents it needs to review.  The parties disagree as to scope of the remand.  And the Court left this question somewhat open in its

scheduling order, finding that

> the documents to be reviewed upon remand in this matter will be those documents that were prepared after the Boehringer/Barr settlement agreements were executed (i.e., 1947, 2331, 2333, and 2387), and those non-duplicative documents identified in Categories A, B, and E of Judge Facciola's Memorandum Opinion and Order [Dkt. 69] to the extent such documents come within the scope of petitioner's appeal as defined in petitioner's opening brief on appeal. See Brief of Appellant Federal Trade Commission, 2013 WL 3271346, at *12–16 (June 28, 2013). Specifically, with regard to the latter, the Court will review non-duplicative documents within Categories A, B, and E that contain (1) financial analyses of the co-promotion agreement, (2) financial forecasts of alternative timelines for generic entry into the market, or (3) financial analyses of settlement options or terms. Such documents will include, at a minimum, those documents identified by respondent in its portion of the Joint Status Report [Dkt. 88] related to the scope of review upon remand (i.e., 810, 811, 832, 833, 901, 973, 992, 1057, 1058, 1290, 1291, 1344, 1396, 1397, 2578, 2580, 2983, 2984, and 3058).

Dec. 2, 2015 Order at 1–2. Having reviewed the parties' briefs and the entire sample of documents transmitted on appeal to the D.C. Circuit, the Court is now prepared to define precisely the documents within the scope of the appellate court's remand. Those documents are as follows: 617, 791, 810, 811, 815, 819, 832, 833, 858, 861, 901, 902, 908, 973, 992, 1008, 1040, 1057, 1058, 1290, 1291, 1333, 1341, 1344, 1365, 1381, 1396, 1397, 1947, 2331, 2333, 2364, 2387, 2550, 2578, 2580, 2918, 2980, 2983, 2984, 3058, and 3328.[5]

The total body of documents is compiled from several sources. First, the Court has of course included those documents it identified in its December 2, 2015 Order. Second, the Court has reviewed several documents which Boehringer addressed in its post-remand briefing which were not on the Court's list from December 2. After reviewing those documents, the Court is satisfied that they also fall within the categories it set forth in the December 2 Order, as Boehringer appears to concede. Those documents are: 617, 815, 819, 858, 861, 908, 1008, 1333, 1341, 2550, and 2980.

---

[5] To be clear, if a document transmitted on appeal to the Court of Appeals does not appear on this list, then it is not within the scope of the remand and Boehringer is under no obligation to produce it.

Finally, there are additional documents which the Court did not identify in its December 2 Order and neither party addressed in their supplemental briefing.  In reviewing the record in this case, the Court reviewed each and every document transmitted on appeal to the D.C. Circuit.  Although this Court in its prior opinion defined several categories for the documents at issue here, see Boehringer I, 286 F.R.D. at 112, the Court took a fresh look at all the documents on appeal to determine whether they fairly concerned the subject matter of the remand, as defined in the December 2 Order.  From that comprehensive review, the Court finds that these additional documents fall within the scope of the remand:  791, 902, 1040, 1365, 1381, 2364, 2918, and 3328.  From those three sources – the December 2, 2015 Order, Boehringer's briefing, and this Court's own second look at the appeal – the Court compiled the full list above.

## B.      Motion for Leave to File Supplemental Ex Parte Affidavit of Marla Persky

An important part of this proceeding concerns the propriety of the Court considering in camera, ex parte affidavits submitted by Boehringer to support its privilege claims.  As the Court has already found, the FTC has waived its complaints about the use of ex parte affidavits prior to the appeal.  See Dec. 2, 2015 Order at 3.  In its supplemental briefing following remand, Boehringer again asks the Court to review such an affidavit from Persky.  Decl. Mot. at 1.  With its motion, Boehringer submitted Persky's supplemental declaration to the Court in camera and ex parte.  See id.  As instructed by the Court, Boehringer also filed a redacted version of her affidavit on the public docket.  See id.

In its scheduling order, the Court left open to Boehringer the option to request leave to file ex parte affidavits in connection with its supplemental briefing.  Dec. 2, 2015 Order at 2.  Nevertheless, the Court gave clear warning that, under the law in this Circuit, "the use of ex parte affidavits is disfavored[.]"  Id. (citing Armstrong v. Exec. Office of the President, 97 F.3d 575,

580 (D.C. Cir. 1996); Lykins, 725 F.2d at 1465).  Cases warranting the use of ex parte affidavits

are usually limited to those implicating national security matters or grand jury proceedings.  See

In re Miller, 438 F.3d 1141, 1151 (D.C. Cir. 2006); Am. Immigration Council v. U.S. Dep't of

Homeland Sec., 950 F. Supp. 2d 221, 244 (D.D.C. 2013).  Additionally, even when ex parte

affidavits are permitted, the D.C. Circuit requires the Court to find that the interests of the

adversary process are outweighed by other crucial interests.  Armstrong, 97 F.3d at 580.  As the

Court reasoned in its prior order, "[i]n cases involving the assertion of attorney-client privilege

and work-product protection, this showing may be difficult to make since the facts laying the

foundation for an assertion of privilege generally are not themselves privileged."  Dec. 2, 2015

Order at 2.

Boehringer contends that Persky's declaration is important because it will explain why

the documents at issue reflect her mental impressions, thus raising those documents to the level

of opinion work product.  Id. at 1.  Boehringer asserts that in camera, ex parte affidavits are

permissible in privilege disputes like this one.  Id. at 2.  Moreover, Boehringer complains that

failure to consider Persky's affidavit will "creat[e] a double bind for Boehringer," reasoning that

> [e]ither [Boehringer] would be required to submit no testimony regarding why the
> documents at issue reveal Ms. Persky's mental impressions – which would subject
> it to criticism that it did not adequately support its claim that the documents are
> protectable opinion work product and increase the risk that it would be ordered to
> produce the documents to the FTC – or it would be forced to reveal to the FTC
> the very mental impressions it is attempting to shield through this litigation.

Id.  In Boehringer's view, the Court "has an affirmative obligation to avoid that exceedingly

unfair result."  Id.  Furthermore, Boehringer argues, the fact that it has filed a redacted version of

the affidavit on the public docket gives the FTC a sufficient basis on which to analyze and

contest the assertions in the affidavit.  Id. at 3.  Thus, Boehringer believes it has allayed the

Court's concern with harming the open adversary process through the use of ex parte affidavits.

Id.

The FTC rejoins that the use of ex parte affidavits is disfavored.  Decl. Mot. Opp. at 1.  In this case in particular, the FTC argues that ex parte declarations are unnecessary because a sufficient evidentiary record exists on which the Court can review the privilege claims.  Id. According to the FTC, ex parte affidavits should only be used when "'absolutely necessary'" and when "'other crucial interests'" outweigh the general interest in the adversary process.  Id. at 2 (quoting Lykins v. Dep't of Justice, 725 F.2d 1455, 1465 (D.C. Cir. 1984)).  The FTC argues that ex parte submissions are not "absolutely necessary" in this case because "'the facts laying the foundation for an assertion of privilege generally are not themselves privileged.'"  Id. (quoting Dec. 2, 2015 Order at 2).  Thus, the FTC reasons, Boehringer must be able to articulate why the documents constitute opinion work product using non-privileged, foundational facts.  Id. "Indeed, by insisting that it must identify for the Court in an ex parte affidavit the attorney mental impressions the documents purportedly reveal, Boehringer implicitly acknowledges that the documents themselves do not actually reveal any opinion work product."  Id.

Additionally, the FTC claims that there are no other "crucial interests" at issue here which support the use of ex parte submissions.  Id. at 3.  In this Circuit, the FTC contends, such interests are normally limited to matters of national security and grand jury investigations.  Id.  In a "routine privilege dispute" like this one, ex parte affidavits are inappropriate.  Id.  In the FTC's view, Boehringer's commercial and litigation interests fall well short of the sort of "crucial interests" needed to outweigh the interest in full disclosure inherent in our adversary system.  Id. Finally, the FTC contends that there are no new facts or legal standards for the Court to apply on remand.  Id.  Because of this, the FTC argues, there is no need for "new evidence" like Persky's supplemental affidavit.  Id. at 3–4.  In closing, the FTC requests that the Court order Boehringer

to produce an unredacted copy of Persky's affidavit or, in the alternative, an affidavit with as few

redactions as are absolutely necessary, as approved by the Court.  Id. at 4.

In reply, Boehringer argues that Persky's supplemental affidavit is necessary to clarify

the circumstances surrounding the creation of the documents at issue, circumstances which "had

been misapprehended by the D.C. Circuit."  Decl. Mot. Reply at 1.  Further, Boehringer claims,

the FTC is wrong that Boehringer may only rely on non-privileged facts in order to support its

privilege claims.  Id. at 2.  Instead, Boehringer contends, it is entitled to reveal the specific

mental impressions underlying its claims to the Court without also revealing them publicly.  Id.

Moreover, Boehringer reasons that Persky's sworn statements are important to explain the

mental impressions that would be revealed by disclosure of the documents, since many of them

"might not be apparent from the face of the document" given the Court's lack of expertise in the

commercial and patent matters underlying this case.  Id. at 1–2.  By contrast, Boehringer asserts

that the FTC, with its deep understanding of the industry and the Boehringer-Barr litigation,

would be able to discern the basis for the privilege assertions from the privilege log and Persky's

redacted affidavit.  Id.  Boehringer also reiterates that a privilege dispute like this one can raise

the need for ex parte affidavits without implicating national security or grand jury secrecy.  Id. at

3.  In Boehringer's estimation, this case is not a "garden variety" privilege dispute given the

complexity of the underlying deal.  Id. at 4.

Having considered the parties' arguments, the Court will deny Boehringer's motion for

leave to file Persky's ex parte affidavit because it has not met its high burden to show that the

affidavit is necessary or appropriate in these circumstances.  It is true that the complexities of the

pharmaceutical industry and patent litigation are daunting.  It is also true that Persky's affidavit

gives some context to those complexities.  Nevertheless, the business interests implicated in the

instant dispute fall well short of the types of interests that appropriately deserve ex parte

treatment – i.e., national security and grand jury matters.  See In re Miller, 438 F.3d at 1151;

Am. Immigration Council, 950 F. Supp. 2d at 244.  Boehringer is right that in Lykins, the Court

of Appeals observed that "we have never limited the use of in camera affidavits to national

security cases," yet Boehringer fails to quote the whole sentence, which closes, "but we have

expressed reservations about such use in cases which do not involve national security."  Lykins,

725 F.2d at 1465.  The Court finds that Boehringer has failed to identify a crucial interest, on par

with national security or grand jury secrecy, that outweighs the strong public interest in open,

adversarial proceedings.  Armstrong, 97 F.3d at 580.

     Boehringer's cited cases involving the submission of ex parte affidavits are inapt.  In

several of them, the court permitted in camera submission of an affidavit without comment or

analysis.  See FPL Grp., Inc. v. IRG, 698 F. Supp. 2d 66, 84 (D.D.C. 2010); Alexander v. FBI,

192 F.R.D. 12, 16 n.3 (D.D.C. 2000); Intelsat USA Sales LLC v. Juch-Tech, Inc., 305 F.R.D. 3,

10 n.3 (D.D.C. 2014).  Moreover, most of them do not involve the kind of business interests at

issue in this case.  See FPL Grp., 698 F. Supp. 2d at 69 (FOIA request for disclosure of IRS

internal decisional memoranda); Alexander, 192 F.R.D. at 16 (assertion of attorney-client

privilege over communications between the President and his attorneys); Life Extension

Foundation, Inc. v. IRS, 915 F. Supp. 2d 174, 185–86 (D.D.C. 2013) (assertion of privilege over

IRS documents under FOIA Exemption 7(D), which protects information that, if revealed, would

"seriously impair federal tax administration").

     Furthermore, Boehringer misses the mark when it claims that the complexity of the issues

underlying this case supports Persky's ex parte submission.  The Court, with its legal expertise,

is well-equipped to assess assertions of privilege.  Whether the matters underlying the privilege

dispute are complicated should have little impact on the legal questions this Court must answer. The Court has located no authority, and Boehringer has cited none, for the proposition that the complexity of issues underlying a privilege assertion alone warrants ex parte treatment. No one disputes that these issues are complicated. But if complexity alone was the appropriate standard, there would be no rational limit to the use of ex parte affidavits in privilege disputes relating to commercial litigation. And moreover, as explained further below, even if the Court accepted Persky's affidavit, none of its substantive rulings would change. See infra Part C.2. Thus, Boehringer suffers from no double-bind here since the testimony it hoped to submit would not persuade the Court to do anything differently.

Accordingly, the Court will deny Boehringer's motion for leave to file in camera and ex parte the supplemental affidavit of attorney Persky.

### C.     Work-Product Protection

All the documents on remand from the D.C. Circuit, listed in Part A, bear claims of work-product protection. As set forth above, examining claims of work-product protection normally involves a multi-step analysis. But here, only one question remains for the Court to decide – whether the documents at issue constitute fact or opinion work product. Boehringer II, 778 F.3d at 153. As to the other parts of the analysis, this Court has already concluded that the documents sought are relevant to the FTC's investigation, and the Court of Appeals affirmed that finding. Id. at 154. Similarly, the D.C. Circuit affirmed this Court's implicit finding that the FTC satisfied the substantial need and undue hardship requirements to obtain any fact work product within these materials. Id. at 157–58. Finally, although the Court of Appeals did not conclusively determine that the post-settlement documents were created in anticipation of litigation, the FTC conceded as much in its supplemental brief. Pet. Suppl. Br. at 3 n.4 ("[T]he

FTC does not dispute that the post-settlement documents, nos. 1947, 2331, 2333, and 2387, are work product. . . .   The FTC does, however, disagree that Boehringer has proven that these post-settlement documents qualify as opinion work product.").

1.     Post-Settlement Documents

Boehringer first defends the documents it created after the Barr settlement.  Resp. Suppl. Br. at 5.  These documents are 1947, 2331, 2333, and 2387.  Id.  Boehringer argues that these documents constitute opinion work product because they analyze a potential settlement in another case between Boehringer and another a pharmaceutical company, Mylan.  Id.  Those analyses, according to Boehringer, are opinion work product for two reasons.  Id. at 6.  First, they reveal its attorneys' mental impressions with respect to the Mylan litigation.  Id. at 6–8.  Second, they incorporate the opinion work product developed for use in the Boehringer-Barr settlement negotiations.  Id.  Boehringer contends that Persky's assessment of the Mylan settlement options required her to consider whether any of those options would impact Boehringer's obligations under the Barr settlement agreement.  Id.  These post-settlement analyses also considered various ways to minimize "litigation uncertainties" that might result from potential outcomes in the Mylan litigation and how those uncertainties might affect the Barr settlement.  Id.  In Boehringer's view, "analysis of the Mylan litigation is inextricably intertwined with Ms. Persky's impressions regarding the Barr settlement."  Id. at 6.  Thus, Boehringer argues that all the post-Barr-settlement, pre-Mylan-settlement documents are protectable as opinion work product.

The FTC does not devote argument to the post-settlement documents specifically. Instead, it argues generally that any financial analysis prepared in connection with the Boehringer-Barr settlement or, apparently, the Boehringer-Mylan settlement, constitutes

discoverable fact work product.  The Court likewise sees no need to analyze these documents separately.  The analysis below applies with equal force to the post-settlement documents.

> 2. Financial Analyses of the Co-Promotion Agreement and the Boehringer-Barr Settlement

All the documents at issue on remand, save the four post-settlement documents listed above and five email chains identified below, are financial analyses of the Aggrenox co-promotion agreement, possible litigation outcomes, and the terms of Boehringer-Barr settlement generally.  See id. at 11–16.  For these documents, Boehringer argues that disclosing them would reveal Persky's mental impressions.  Id. at 8.  Boehringer, fighting an uphill battle against the Court of Appeals' opinion, now stresses that Persky requested these analyses, and the specific variables analyzed therein, in her capacity as Boehringer's lawyer, not as a businessperson.  Id. Boehringer's arguments focus on several key themes.  First, the analyses reflect Persky's mental impressions because she "identified particular economic parameters that were particularly important to her settlement strategy for the litigation matters and asked the businesspeople at Boehringer to gather information regarding those economic parameters."  Id. at 9.  Second, the analyses represent opinion work product because she used them to provide advice to her client regarding which litigation outcomes or settlement options would be economically feasible and commercially reasonable.  Id.  Third, she used the analyses to provide legal advice to Boehringer regarding potential antitrust scrutiny from the FTC over the co-promotion agreement or the settlement.  Id.

Boehringer contends that although its business executives made the final settlement decisions, they did not make those decisions until Persky presented them with her legal advice based on the financial analyses she requested.  Id. at 9.  In this way, Persky's mental impressions, embodied in the analyses she requested based on the economic variables she set, were not the

mental impressions of a mere layperson.  Id. at 11.  In Boehringer's view, the Court of Appeals was wrong to say that Persky "parroted" the views of business managers.  Id. at 10.  Indeed, to Boehringer, the Court of Appeals had it backwards:  it was Persky, not any business executive, who initially determined which factors were important to her in rendering legal advice to her client about economic desirability and antitrust exposure of settlement.  Id.  That the business managers later used her analyses and advice to choose settlement options does not mean that she was simply their mouthpiece.  Id.  In other words, the analyses she requested represent more than a "'general interest in the financials of the deal'"; rather, they were integral to Persky's development of litigation strategy.  Id. (quoting Boehringer II, 778 F.3d at 152).

The FTC disagrees, relying heavily on favorable language from the D.C. Circuit's opinion, which suggests that Boehringer's privilege claims are overblown.  Pet. Suppl. Br. at 1. First, the FTC contends that a document cannot be considered opinion work product unless it actually reveals an attorney's mental impressions.  Id. at 3.  In a case like this one, where Boehringer seeks to protect factual analyses requested by an attorney, the FTC argues that Boehringer must show that Persky's request for information or selection of variables "'reflects the attorney's focus in a meaningful way.'"  Id. (quoting Boehringer II, 778 F.3d at 151).  Merely asking for information is, in the FTC's view, insufficient.  Id. at 6–8.  Second, the FTC claims that Boehringer business executives, not Persky, selected the variables used in the financial analyses.  Id. at 9.  Because Persky did not define what data to analyze, the "frameworks" argument on which Boehringer so heavily relies is fundamentally flawed.  Id. at 11.  Third, even assuming Persky was involved in formulating the assumptions and parameters for these financial analyses, the FTC contends that she acted not as a lawyer but as a business advisor.  Id. at 11–13. Thus, her input, if it can be gleaned from the analyses themselves, was not legal in nature.  Id.

Finally, the FTC requests that the Court order Boehringer to redact any of Persky's legal mental impressions from the documents and order the rest produced.  Id. at 14.

The Court holds that the vast majority of the documents at issue on remand constitute fact work product.  Many of the log entries are PowerPoint presentations, charts, graphs, and tables analyzing possible factual scenarios affecting the Boehringer-Barr settlement and the co-promotion agreement.  These charts, even assuming they were created at Persky's behest and analyze variables she identified, do not sufficiently reflect her mental impressions regarding which scenarios were legally feasible or desirable.  Instead, they reflect a broad-ranging factual analysis of many possible litigation and settlement outcomes.  Persky avers that she took these analyses and then presented the ones she thought best to her client in order to frame their settlement strategy.  See, e.g., Decl. Mot., Ex. B at 5 ¶ 11 ("I used this and other financial analyses of proposed settlement terms that were prepared at my request as settlement discussions progressed to assist me in providing legal advice to my clients.").  But the charts themselves do not reflect this analysis.  Instead, as explained below, if legal analysis is to be found anywhere in these documents, it is in the emails transmitting the charts, graphs, and spreadsheets.

Moreover, Persky's mere selection of variables for Boehringer staff to analyze does not rise to the level of reflecting her mental impressions regarding the case; instead, those variables are ones which any reasonable businessperson in her position would analyze in this situation.  For fact work product to rise to the level of opinion work product, the attorney must have meaningful involvement in the selection of the data that goes into the work product.  Boehringer II, 778 F.3d at 151.  And, even if this is true, there must also be a risk that revealing the data will reveal the attorney's mental impressions.  Id.  There is nothing in the documents themselves that reveals Persky's analysis of the legal issues at hand, even if she used those documents in her

ultimate analysis.  Persky's due diligence as a data analyst for her client does not mean that every piece of data she touched becomes opinion work-product.

The parties dispute whether it was Persky or "business people" at Boehringer who provided the parameters, assumptions, and variables to analyze.  See Pet. Suppl. Br. at 9.  The Court need not wade into that dispute here however, since the analyses would not qualify as opinion work product even if Persky herself chose all relevant variables.  Put simply, the instructions to compile data on a wide number of possible factual scenarios are insufficiently specific to reveal anyone's legal mental impressions about the case.  In the Court of Appeals' words, Persky's mental impressions, if any, in these analyses were no more than a layman would have in these circumstances and do not reveal "something of legal significance."  Id. at 152–53.  Because of this, it does not matter whether Persky was "simply parroting the thoughts of the business managers," an assertion Boehringer strenuously denies.  Id. at 153; Resp. Suppl. Br. at 8.  Whether or not the thoughts were her own, the mental impressions revealed by these documents are, at best, those that a businessperson would have in the same situation.  They do not reflect Persky's impressions as a legal advisor.

Although the Court declines to admit Persky's supplemental, ex parte affidavit as evidence to support Boehringer's claims of work-product protection, the Court has reviewed it, and the context Persky provides therein actually undermines rather than strengthens Boehringer's arguments.  In her affidavit, Persky explains why she chose certain financial variables over others that Boehringer employees should analyze.  In this way, Persky gives away that her involvement in the creation of these documents was merely directory.  She did not cull the data she received, at least not in the documents now before the Court.  See Willingham, 228 F.R.D. at 6 (observing that courts sometimes protect factual documents where the facts have been

"distilled" by the attorney for use in providing legal opinions or services).  None of the documents reveal how she analyzed the data she requested or what data or scenarios she presented to her client.  In other words, she did not "sharply focu[s] or wee[d]" the facts contained in these documents such that revealing these facts would reveal her legal impressions of the case.  Boehringer II, 778 F.3d at 152.

For example, with respect to log entry 973, a PowerPoint presentation containing charts analyzing various litigation and settlement scenarios on Mirapex sales, Persky avers that she used the data in the chart "to assist [her] in providing legal advice" concerning those potential outcomes.  See Decl. Mot., Ex. B at 9 ¶ 18.  But the actual advice she gave is nowhere to be found in that document.  That she used fact work product to assist her in giving advice to her client is unsurprising.  That data is not transformed into opinion work product merely because she later used it.  See Willingham, 228 F.R.D. at 6–7 (finding that documents reviewed by counsel to prepare a legal memorandum were not protected as work product simply because they were attached to the resulting memorandum).  The story might be different if Boehringer presented charts or graphs prepared or edited by Persky after they were created.  In that case, Persky would have had a direct hand in deciding which data and which scenarios to present her client.  Her sorting of the information might meaningfully probe her mental impressions.  The Court has no occasion to decide that closer question, however, because there is no suggestion in the briefs or the documents themselves that Persky actually created or edited these analyses.

Additionally, Boehringer's cited cases miss the mark.  Boehringer relies on United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998), for the proposition that assessment of a party's prospects in litigation qualifies as opinion work product.  Resp. Suppl. Br. at 6.  But this is simply an incorrect reading of the case.  There, the Second Circuit determined that a document

with both legal and business purposes was <u>eligible</u> for work-product protection.  <u>Adlman</u>, 134

F.3d at 1202–03.  That is not in dispute here, as the parties agree that all the documents at issue

meet the threshold requirements for work-product protection.  Because the court in <u>Adlman</u>

made no determination as to whether the documents it reviewed contained fact or opinion work

product, <u>see</u> <u>id.</u>, its analysis does not help the Court with its present task.  The same goes for

<u>Nicholas v. Bituminous Casualty Corp.</u>, 235 F.R.D. 325, 332–33 (N.D. W. Va. 2006), and

<u>Kellogg USA, Inc. v. B. Fernandez Hermanos, Inc.</u>, 269 F.R.D. 95, 100 (D.P.R. 2009), since the

courts in those cases decided only whether the documents at issue had been prepared in

anticipation of litigation.  Similarly, the Tenth Circuit in <u>Frontier Refining, Inc. v. Gorman-Rupp</u>

<u>Co.</u>, 136 F.3d 695, 702–04 (10th Cir. 1998), only touched on the issue of whether work product

from one litigation retains protection in later, unrelated litigation, not whether the documents at

issue contained fact or opinion work product.

Boehringer's other cited cases further underscore why its work-product claims in this

case should fail.  For instance, in <u>In re Imperial Corp. of America</u>, 167 F.R.D. 447, 454 (S.D.

Cal. 1995), the court concluded that letters from attorney to client constituted opinion work

product.  The letters revealed counsel's "candid analysis of the factual circumstances and legal

issues" arising in the case.  <u>Id.</u>  Thus, <u>In re Imperial Corp.</u> represents a clear-cut case involving

opinion work product.  By contrast, as explained above, Persky's use of factual information in

forming legal opinions and advice does not warrant protection of that factual information at the

same level as the opinions or advice later formed.  Likewise, this case is very different from

<u>Bush Development Corp. v. Harbour Place Association</u>, 632 F. Supp. 1359, 1363 (E.D. Va.

1986), in which the court found that an attorney's handwritten notes on a draft complaint, which

reflected the attorney's assessment of the likelihood of success on the claims, constituted opinion

work product.  Unlike that case, here Boehringer's charts, graphs, and spreadsheets do not reflect

Persky's assessments of the viability of success of Boehringer's litigation or settlement strategy.

Indeed, the facts contained in these documents did no more than equip Persky to make those

assessments.  See also United States v. Nat'l Ass'n of Realtors, 242 F.R.D. 491, 496 (N.D. Ill.

2007) (protecting as opinion work product two draft articles for defendant's industry magazine

regarding how to comply with antitrust laws which contained in-house counsel's notes and

edits).

Similarly, Concord Boat Corp. v. Brunswick Corp., No. LR–C–95–781, 1997 WL

34854479, at *2 (E.D. Ark. June 13, 1997), is distinguishable.  There, the defendant's counsel

sent several letters to the FTC which discussed facts and legal issues relating to the FTC's

antitrust investigation against the defendant.  Id. at *1.  The court found that these documents

were "opinion work product in the classic sense," even where the documents revealed only facts,

because they conveyed counsel's impressions regarding the legal issues in play and the facts

relevant to those issues.  Id. at *2.  But here, Boehringer's documents themselves give no

indication that they were prepared for use in a discussion of antitrust liability.  If they were used

for that purpose later, it does not affect their classification under the work-product doctrine.

Moreover, whereas in Concord it was apparent from the face of the documents that they reflected

counsel's selection of particular facts for use in providing antitrust analysis, here the charts and

spreadsheets reflect a huge number of scenarios based on different litigation and settlement

outcomes.  Persky's sorting of the relevant facts from out of these analyses in order to form her

opinions came only later.  See also Willingham, 228 F.R.D. at 6 (protecting documents created

by counsel during EEO administrative proceedings because they reflected "counsel's analysis of

the merits of the agency's imposition of indefinite suspension, their assessment of the importance

of the case from an agency-wide point of view, or their thoughts regarding possible settlement").

Five documents before the Court on remand – 810, 832, 1057, 2578, and 2983 – are not spreadsheets or charts but are instead email chains.  Documents 810 and 832 are merely transmittal emails, which the Court would not otherwise have considered to be within the scope of the remand absent the parties' suggestion that they were in their Joint Report.  See J. Rep. at 1–12.  Those documents reveal no attorney's mental impressions – or anyone else's, for that matter – and so they are merely fact work product.

Documents 1057, 2578, and 2983 are email chains including Boehringer executives and in-house counsel.  The Court finds that these emails reflect the analysis of both Boehringer staff and attorneys regarding the financial analyses attached to the emails.  Revealing these three email strings, unlike revealing the documents attached to them, would expose the mental impressions of Boehringer's counsel regarding the case.  Discovering such information is nearly impossible, Boehringer II, 778 F.3d at 153, and the FTC nowhere argues that it is entitled to discover Boehringer's opinion work product.  The Court need not give these documents thorough treatment, however, because each is also protected by Boehringer's alternative assertion of the attorney-client privilege, as explained below.

Accordingly, the Court holds that all but three of the documents within the scope of the remand qualify only as fact work product.  To be clear, the Court concludes that each document listed in Part A above is fact work product except documents 1057, 2578, and 2983.  Many of these documents containing factual work product, however, also bear an assertion of the attorney-client privilege.  Those documents are not subject to disclosure for the reasons stated in Part D below.  The documents that are fact work product and do not also bear a claim of attorney-client privilege are as follows:  810, 832, 861, 901, 992, 1344, 1396, 1397, 1947, and

2333. Because the Court of Appeals has already concluded that the FTC has shown sufficient

need for these documents if they are fact work product, and because there is no alternative

assertion of the attorney-client privilege as to these documents, the Court will direct Boehringer

to produce these documents.

### D.    Attorney-Client Privilege

The Court must next consider Boehringer's alternative assertion of the attorney-client

privilege with respect to several of the documents at issue on remand. The parties were ordered

not to re-brief the attorney-client issue in their post-remand supplemental briefing, Dec. 2, 2015

Order at 2–3, so the Court will refer instead to the parties' arguments as they appear in their pre-

appeal briefs and memoranda.[6] The documents for which Boehringer has claimed the attorney-

client privilege in addition to asserting work-product protection are as follows:  617, 791, 811,

815, 819, 833, 858, 902, 908, 973, 1008, 1040, 1057, 1058, 1290, 1291, 1333, 1341, 1365, 1381,

2331, 2364, 2387, 2550, 2578, 2580, 2918, 2980, 2983, 2984, 3058, and 3328.[7]

---

[6] The Court discusses the arguments on attorney-client privilege presented in the parties' briefing surrounding the FTC's June 2010 status memorandum. The parties engaged in a new round of briefing in response to the FTC's October 2010 status memorandum. Those briefs largely restate the arguments made in June, so the Court will refer to the October briefing only as the need arises. See October 2010 Status Report of the Federal Trade Commission [Dkt. 41]; Boehringer Ingelheim Pharmaceuticals, Inc.'s Response to the Federal Trade Commission's October 2010 Status Report [Dkt. 44]; Federal Trade Commission's Reply Status Report [Dkt. 47].

[7] In reviewing the record, the Court observed that Boehringer's assertions of the attorney-client privilege appeared to be inconsistent. The documents for which Boehringer claimed attorney-client privilege in its post-remand briefing were not the same as in its pre-remand privilege log. Compare Resp. Suppl. Br. at 3, with June 2010 Status Memo., Ex. B, Exs. 11–16 (containing the original and subsequent revisions of Boehringer's privilege log). The post-remand briefing asserts the attorney-client privilege for certain documents although the privilege is not asserted for those same documents in the pre-remand privilege log. Those documents are:  811, 815, 833, 973, 1057, 1058, 1290, 1291, 1341, 2331, 2387, 2550, 2580, and 2984.

The Court ordered the parties to address this discrepancy because of its concern that Boehringer may have been attempting to expand its claims of attorney-client privilege following the remand. See July 12, 2016 Order [Dkt. 97]. But Boehringer's response to the Court's Order demonstrates that the Court simply misunderstood the matter. In their original in camera submissions to Magistrate Judge Facciola, the parties identified these fourteen documents as subject to attorney-client privilege claims even though they were not included in Boehringer's privilege log. See Boehringer Ingelheim Pharmaceuticals, Inc.'s Resp. to July 12, 2016 Order [Dkt. 99] at 2–3. The FTC did not object at that time to the Court considering those privilege claims, and neither does it do so now. See id. at 3–4 ("[T]he FTC has authorized Boehringer to represent that it does not oppose the Court's consideration of attorney-client claims as to these documents ").

The FTC raises two primary arguments in opposition to Boehringer's attorney-client privilege claims.  First, it contends that many of the documents constitute no more than non-legal, business-oriented communications regarding the Boehringer-Barr settlement.  June 2010 Status Memo. at 21.  Indeed, as the FTC asserts, the basis of Boehringer's privilege claims appears to be merely that an attorney was copied on the communication.  Id.  Second, the FTC complains that Boehringer's "cryptic" and "conclusory" log entries fail to provide the detailed explanation necessary to show that the privilege applies.  Id. at 21–22.

Boehringer responds that it is the FTC's challenge to its privilege claims, and not the claims themselves, which are conclusory.  June 2010 Status Memo. Resp. at 29.  Boehringer defends its privilege log as sufficient to describe and explain the basis for its privilege assertions.  Id. at 30.  Furthermore, Boehringer points to the more thorough account of the basis of its privilege claims it gave in a letter to the FTC prior to the FTC's June 2010 status report.  See id., Ex. 3 at 8–10.  Boehringer concedes that "simply routing a document through an attorney does not make it privileged" but argues that such is not the case here.  Id.  Instead, Boehringer claims that its privilege assertions are appropriate because the communications at issue represent (1) its counsel requesting information for the purpose of rendering legal advice or (2) its employees providing information to counsel for the purpose of providing legal advice for the company.  Id. at 30–31.  Moreover, Boehringer argues that it is immaterial whether an attorney was the direct recipient of an email rather than simply copied on it.  Id. at 31.  The crucial fact, in Boehringer's view, is that the context of the communications and their content, apart from their senders and

recipients, reveal that they are fairly aimed at giving or requesting legal advice.  Id. at 31–32.[8]

The FTC replies that the communications at issue do not constitute attorney-client communications because "they involve financial spreadsheets, forecasts, and related communications."  June 2010 Status Memo. Reply at 15.  Like Boehringer's work-product claims, the FTC sees Boehringer's attorney-client privilege claims as an impermissible attempt to protect ordinary business- and financial-related discussions merely because an attorney happened to be involved.  Id.  And, the FTC asserts, even if the lawyer was engaged in a legal capacity, Boehringer has failed to show that the communication was made primarily for the purpose of requesting or rendering legal advice.  Id. at 16.  Merely copying in-house counsel on an email to keep them abreast of a situation does not, the FTC contends, rise to the level of an attorney-client communication.  Id. at 17.

Boehringer filed a supplemental response to the FTC's status memorandum.  See June 2010 Status Memo. Suppl. Resp.  In it, Boehringer again asserts that the fact that lawyers were only copied on emails, or that no lawyers were included at all, is not dispositive of their privilege claims.  Id. at 8–9.  Rather, those communications should still be protected because they were prepared at the direction of counsel and contain information requested by counsel for the purpose of rendering legal advice.  Id. at 9–10.

For the most part, for the reasons stated below, the Court will uphold Boehringer's assertion of the attorney-client privilege.  Only a few documents reflect express requests for or provision of legal advice.  Rather, as might be surmised from the discussion above, most of the

---

[8] In an October 2010 brief, Boehringer continued to defend these documents for similar reasons.  See supra note 6.  Additionally, in that brief, Boehringer mentioned that several of the documents were marked or stamped as "privileged" or "confidential."  See Boehringer Ingelheim Pharmaceuticals, Inc.'s Response to the Federal Trade Commission's October 2010 Status Report [Dkt. 44] at 9.  The Court pauses over this argument only briefly to emphasize that "[w]hatever other properties 'Attorney-client privilege' stamps may have, they certainly do not carry the talismanic power to relieve a party of its obligation to prove each of the privilege's elements in order to take shelter under its protection."  United States v. Singhal, 800 F. Supp. 2d 1, 10 (D.D.C. 2011).

documents are mere compilations of facts.  Yet factual material compiled during a corporation's internal investigations is analyzed differently under the work-product doctrine and the attorney-client privilege.  For the attorney-client privilege, unlike the work-product doctrine, facts collected at counsel's request for later use in providing legal advice are protected.  Moreover, the Court of Appeals has endorsed a liberal standard for finding that a communication falls within the attorney-client privilege, finding that a communication should be protected if "obtaining or providing legal advice was one of the significant purposes of the attorney-client communication."  In re Kellogg, 756 F.3d at 756.  While Boehringer's documents may have had some business purposes, it is equally clear that one of their significant purposes was to enable Persky and her co-counsel to give Boehringer legal advice.

In the Court's view, it is helpful to break down the documents under consideration into two categories by type.  First are emails, whether between Boehringer employees and counsel or between employees alone.  Second, the Court will examine attachments to those emails – i.e., spreadsheets, charts, graphs, and PowerPoint presentations.  Both categories will be discussed separately in turn.

1.      Emails

The smaller and easier category to deal with are the emails.  Out of the documents for which attorney-client privilege was claimed, only three are emails – 1057, 2578, and 2983.  The Court's rulings as to those documents are below.

**1057**.  This is an email from one Boehringer business executive to another.  In it, the author reports certain information that the recipient had requested.  The author's information was apparently gleaned from two financial analyses attached to the email.  There is no request for or provision of legal advice in this email.  Nevertheless, Boehringer represents that this document

"[was] prepared to inform [its] attorneys, including the general counsel as well as other attorneys representing [Boehringer], of facts relevant to the analysis of the legal issues involved in the litigation or the settlements."  See Boehringer's Resp. to July 12, 2016 Order [Dkt. 99], Ex. A at 5.  The Court finds that this document should be protected because disclosure would reveal the facts transmitted to the attorneys from the Boehringer businesspeople which enabled counsel to give the corporation legal advice.  See infra Part D.2.  Accordingly, the email is privileged in its entirety.

**2578**.  This is an email from Persky herself to Boehringer directors.  To the email are attached several documents, which Persky describes in the email as analyses of the state of the Mirapex and Aggrenox litigation and of various settlement options.  Persky also provides her advice to the directors, based on the analyses in the attachments, regarding what results would likely obtain in litigation if settlement was unsuccessful.  Persky's advice to her client based on data compiled by Boehringer employees easily falls within the attorney-client wheelhouse.  This document is protected by the privilege.

**2983**.  This document is another email chain, this time involving Persky and Boehringer executives.  Persky opens the conversation by relaying a settlement offer from Barr and her reactions to it.  Boehringer executives then relay their assessments of the settlement proposal.  This document, like 2578, is the kind of document the attorney-client privilege was meant to protect – a communication between attorney and client regarding litigation strategy based on information kept confidential between them.  This document is therefore privileged.

2.     Email Attachments – PowerPoints, Graphs, Charts, and Spreadsheets

The rest of the documents bearing an attorney-client privilege claim are attachments to emails.  Those log entries, for purposes of clarity, are:  617, 791, 811, 815, 819, 833, 858, 902,

908, 973, 1008, 1040, 1058, 1290, 1291, 1333, 1341, 1365, 1381, 2331, 2364, 2387, 2550, 2580,

2918, 2980, 2984, 3058, and 3328.  As noted above, these attachments are PowerPoint

presentations, charts, graphs, and tables that summarize certain facts regarding the state of the

patent litigation and describe how different settlement and litigation outcomes would affect

Boehringer financially.

As an initial matter, the Court notes that attachments to privileged communications are

not thereby automatically privileged.  O'Connor v. Boeing N.A., Inc., 185 F.R.D. 272, 280 (C.D.

Cal. 1999); Pacamor Bearings, Inc. v. Minebea Co., Ltd., 918 F. Supp. 491, 511 (D.N.H. 1996)

("'Attachments which do not, by their content, fall within the realm of the [attorney-client]

privilege cannot become privileged by merely attaching them to a communication with the

attorney.'") (quoting Sneider v. Kimberly–Clark Corp., 91 F.R.D. 1, 4 (N.D. Ill. 1980)); Leonen

v. Johns–Manville, 135 F.R.D. 94, 98 (D.N.J. 1990) ("Where a privileged document has

attachments, each attachment must individually satisfy the criteria for falling within the

[attorney-client] privilege.  Merely attaching something to a privileged document will not, by

itself, make the attachment privileged.").  Instead, the attachments must independently satisfy the

requirements for the application of the attorney-client privilege.  Leonen, 135 F.R.D. at 98.  Of

course, the email to which a document is attached necessarily provides some context for that

assessment.

The Court finds that these documents, although they are mere factual work product, are

nevertheless subject to the attorney-client privilege.  A straightforward reading of In re Kellogg,

the Court of Appeals' most recent exposition on the privilege, compels this result.  In that case, a

defense contractor conducted an internal investigation into claims that it defrauded the

government.  In re Kellogg, 756 F.3d at 756.  The investigation was conducted by contractor

employees, but was undertaken at the behest of its in-house counsel.  Id.  Litigation arose when a former employee filed a False Claims Act suit against the contractor.  Id.  During discovery, the employee sought documents created during the contractor's internal investigation, which occurred prior to the lawsuit.  Id.  The employee contended that the investigation documents were created to comply with Department of Defense regulations – a business purpose – and not to obtain legal advice.  Id.  The trial court agreed with the employee and ordered production of the documents.  Id.

The Court of Appeals reversed.  Id. at 757.  The D.C. Circuit concluded that the case was indistinguishable from Upjohn, the seminal case in the application of the privilege to corporations.  Id.  In both cases, the corporation "initiated an internal investigation to gather facts and ensure compliance with the law after being informed of potential misconduct."  Id.  Further, in each case the investigation "was conducted under the auspices of [the] in-house legal department, acting in its legal capacity."  Id.

And it did not change the result that the investigation was conducted by the contractor's employees rather than its lawyers, since Upjohn contemplates that the in-house counsel may use non-attorney agents to assist in conducting investigations.  Id. at 758.  The D.C. Circuit required merely that the non-attorney employees understand that their investigation was requested by the company's legal department and that the information found would be kept confidential.  Id.

Finally, and most importantly, the Court of Appeals held that the "primary purpose" test for the attorney-client privilege is not a but-for test, in contrast to the work-product context.  Id. at 759.  Instead, the test for attorney-client communications asks whether "obtaining or providing legal advice was one of the significant purposes of the attorney-client communication."  Id.  The D.C. Circuit rested its conclusion on two related principles.  Id.  First, contemporary corporate

life means that many in-house investigations serve both business and legal purposes.  Id.
Second, given that these purposes may overlap, it does not make sense for courts to try and draw
a bright line between the two.  Id.  All that is required is that obtaining or providing legal advice
be a primary purpose of the communication, not the primary purpose.  Id.

  This case is on all fours with In re Kellogg.  Non-attorney Boehringer employees
prepared the PowerPoints and spreadsheets at issue at Persky's direction to assist in negotiating
the settlement with Barr.  See Boehringer II, 778 F.3d at 152 (noting that the analyses were
requested by Persky and other Boehringer counsel); Boehringer I, 286 F.R.D. at 109 ("The
documents themselves establish the truth of Persky's claims in her affidavit that the documents
were created by [Boehringer] employees in response to her personal requests for financial and
other information.").  And although the documents speak to both business and legal matters, the
Court cannot say that legal advice, whether related to the propriety of various settlement options
or antitrust issues, was not "one of the significant purposes" of these communications.

  Context matters here.  While the documents do not reflect express requests for or
provision of legal advice, they were created during the Boehringer-Barr settlement talks in the
context of their ongoing lawsuit.  As such, one of their primary purposes was to enable
Boehringer's counsel to advise it on how to settle the complex, interlocking lawsuits pending at
the time.  See Banks, 228 F.R.D. at 27 (finding that documents which did not on their face
contain requests for legal advice were nevertheless protected because they were compilations of
facts for use by counsel in providing legal advice); Banks v. Office of Senate Sergeant-at-Arms,
236 F.R.D. 16, 20 (D.D.C. 2006) (finding that notes from interviews of agency employees were
privileged because they were "an integral part of the process of providing information to counsel
so that counsel could provide the sought after legal representation").  The prevalent legal

overtones in these documents, combined with the fact that Boehringer attorneys requested these analyses, satisfies the Court that these were not mere business documents which Boehringer attempted to protect by providing a copy to counsel.  See Simon v. G.D. Searle & Co., 816 F.2d 397, 403 (8th Cir. 1987); Neuder, 194 F.R.D. at 293.  Indeed, this case is even clearer than In re Kellogg or Upjohn, where the investigations at issue were undertaken prior to any lawsuit being filed.  In re Kellogg, 756 F.3d at 756; Upjohn, 449 U.S. at 394.  Unlike those cases, here Boehringer's counsel ordered the creation of these factual analyses to assist in ongoing litigation. See also Maki v. United States, Civil Action No. 7:07cv443, 2008 WL 1756330, at *4 (W.D. Va. Apr. 16, 2008) (rejecting privilege claim for hospital's peer-review where attorney made only a vague claim that she requested the documents be created for use "in the performance of her duties" but did not suggest that they were created for the purpose of seeking legal advice).

Further, under the standard enunciated in In re Kellogg, it is not enough, as the FTC asserts, that these documents were also created for business purposes.  When addressing whether the co-promotion agreement was created "in anticipation of litigation" for work-product purposes, the Court of Appeals held:

> [w]e find no merit in the proposition that any settlement term that has some independent economic value to both parties must always be treated as an ordinary (non-litigation) business transaction for purposes of work product protection. Common sense and practical experience teach that settlement deals routinely include arrangements that could be isolated from the overall agreement and stand on their own but were nonetheless crafted for the purpose of settling litigation.

Boehringer II, 778 F.3d at 150.  Thus, the D.C. Circuit sanctioned the notion that Boehringer's withheld documents could bear on business and legal matters simultaneously.  So too, here, it does not matter that the analyses embodied in these documents reflect business advice about the financial effect of various litigation outcomes and settlement options.  What matters is that one of the significant purposes of these communications was to report on facts gathered at the request

of Persky and other Boehringer counsel for the purpose of providing legal advice, namely,

whether settlement or some other strategy was the appropriate course for the Boehringer-Barr

suit, what settlement terms might be most advantageous for Boehringer, and how the

Boehringer-Barr litigation might impact other cases in which Boehringer had an interest.

The FTC's focus on the sender and recipient of these documents is also misguided.  It is

true that "documents prepared by non-attorneys and addressed to non-attorneys with copies

routed to counsel are generally not privileged since they are not communications made primarily

for legal advice."  Neuder, 194 F.R.D. at 295.  But the principle is more nuanced than the FTC

admits.  The same protections afforded to communications between counsel and client extend to

communications between corporate employees who are working together to compile facts for in-

house counsel to use in rendering legal advice to the company.  See id.  That is precisely what

happened here, and it is not surprising that this occurred given the complexity of the factual

analyses Persky requested.  See also AT&T Corp. v. Microsoft Corp., No. 02–0164 MHP (JL),

2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications between non-lawyer

employees about matters which the parties intend to seek legal advice are likewise cloaked by

attorney-client privilege."); Santrade, LTD v. General Electric Co., 150 F.R.D. 539, 543

(E.D.N.C. 1993) ("A document need not be authored or addressed to an attorney in order to be

properly withheld on attorney-client privilege grounds.").[9]

Because the protective spheres of the work-product doctrine and the attorney-client

_____

[9] Documents 973, 1290, 1291, 1341, 2331, 2364, 2387, and 2550 are uncirculated draft versions of financial
analyses Boehringer staff developed.  Although "[d]rafts, standing alone, are not 'communications' and hence
normally are not within the attorney-client privilege," they can be protected "if the draft itself contains protected
confidential communications from the client or the attorney."  Loftin v. Bande, 258 F.R.D. 31, 35 (D.D.C. 2009)
(citing Ideal Elec. Co. v. Flowserve Corp., 230 F.R.D. 603, 606–07 (D. Nev. 2005)).  In other words, the same basic
principles apply to draft documents as to documents finally communicated to someone else.  Here, the Court sees no
difference between the contents of these documents and the other financial analyses, and finds that the drafts should
be protected for the same reasons as the circulated documents.

privilege are different, this result is not inconsistent with the Court's ruling above that the documents contain only fact work product.  The strong protection afforded to opinion work product exists to protect an attorney's mental impressions about her client's case.  Those mental impressions are not reflected, expressly or otherwise, in the charts, tables, and graphs that make up these documents.  The documents contain only factual compilations and analyses, not legal judgments.  Nevertheless, the attorney-client privilege protects even purely factual communications between attorney and client when those facts are gathered at the request of in-house counsel for the purpose – or at least with a significant purpose – of providing legal advice to the corporation.  The Court finds that was the case here with regard to the PowerPoints and spreadsheets at issue.

The Court recognizes, as did the Court of Appeals in <u>In re Kellogg</u>, that "the attorney-client privilege 'only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.'"  <u>In re Kellogg</u>, 756 F.3d at 764 (quoting <u>Upjohn</u>, 449 U.S. at 395).  There, the D.C. Circuit concluded that the employee "was able to pursue the facts underlying [the contractor's] investigation.  But he was not entitled to [the contractor's] own investigation files."  <u>Id.</u>  Although it imposes costs on the investigative power of the FTC, the Court is bound to hold the FTC to the same principles.  The FTC is perfectly capable of analyzing the same litigation and settlement outcomes Boehringer considered.  It is not entitled to Boehringer's analysis of those facts when those analyses were, in significant part, created at the request of counsel for the purpose of providing legal advice regarding settlement strategy.  This comports with the purposes of the attorney-client privilege, which the Supreme Court long ago said "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to

give sound and informed advice." <u>Upjohn</u>, 449 U.S. at 394.  Accordingly, the Court holds that all documents for which Boehringer claims attorney-client privilege are protected.

## CONCLUSION

For the reasons stated above, the Court will uphold in part and overrule in part Boehringer's objections to producing documents pursuant to the FTC's subpoena.  Out of the documents the Court reviewed on remand, Boehringer shall produce the following:  810, 832, 861, 901, 992, 1344, 1396, 1397, 1947, and 2333.  Those documents are, of course, only part of a sample presented to the Court from the entire body of documents at issue.  Boehringer is directed to apply the Court's rulings to all documents outside the sample which it continues to withhold.  Specifically, Boehringer should produce any previously unproduced documents similar to those identified in Part A above for which work-product protection and not attorney-client privilege was claimed.

An appropriate Order will accompany this Memorandum Opinion.


Date:  September 27, 2016                    _____

                                             G. MICHAEL HARVEY
                                             UNITED STATES MAGISTRATE JUDGE